IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-148

No. 496A20

Filed 17 December 2021

IN THE MATTER OF: A.L.A.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered on 18 August 2020 by Judge David V. Byrd in District Court, Wilkes County. This matter was calendared for argument in the Supreme Court on 12 November 2021 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Vannoy, Colvard, Triplett & Vannoy, P.L.L.C., by Daniel S. Johnson, for petitioner-appellee Wilkes County Department of Social Services.*

*Poyner Spruill LLP, by Caroline P. Mackie, for appellee Guardian ad Litem.*

*Sydney Batch for respondent-appellant mother.*

NEWBY, Chief Justice.

Respondent, the mother of A.L.A. (Adam), appeals from the trial court's order terminating her parental rights.[1] After careful review, we affirm.

Adam was born on 29 January 2016 and lived with respondent in the maternal grandmother's house. Respondent would often leave Adam alone with the maternal grandmother despite the grandmother's inability to properly care for Adam.

---

[1] A pseudonym is used in this opinion to protect the juvenile's identity and for ease of reading.

Moreover, respondent and the maternal grandmother would constantly fight in Adam's presence and engage in substance abuse. Because of this improper supervision and injurious home environment, Wilkes County Department of Social Services (DSS) obtained nonsecure custody of Adam on 27 October 2017 and filed a juvenile petition alleging that he was a neglected and dependent juvenile.[2]

At a hearing on 4 December 2017, respondent consented to the trial court's order adjudicating Adam to be neglected and dependent. The consent order continued Adam in DSS custody, established reunification as the primary plan, and allowed respondent weekly supervised visitation subject to drug screening.

Respondent signed a case plan with DSS on 17 December 2017, which required her to do the following:

> 1) Complete parenting classes at the Wilkes Pregnancy Center;
> 2) Provide a written statement identifying at least ten (10) things learned in parenting classes and how those things would be implemented in her home;
> 3) Provide a written statement on why [Adam] was in foster care;
> 4) Maintain safe and appropriate housing for all of her children;
> 5) Obtain and maintain employment;
> 6) Attend mental health and substance abuse assessments;
> 7) Sign a voluntary support agreement and remain current in paying child support;
> 8) Attend random drug screens;

---

[2] DSS also filed petitions for Adam's brother and sister, but they are not a part of this appeal.

9)      Participate in all scheduled visitation; [and]
10)     Maintain contact with her assigned social worker.

On 14 March 2018, the trial court entered a review order in which it found that respondent was unemployed and continued to reside in the maternal grandmother's home. The trial court further found respondent had made no "recognizable effort or progress" on her case plan and noted its concerns that respondent and the maternal grandmother were continuing to engage in substance abuse. After a hearing on 20 November 2018, the trial court entered a permanency-planning review order establishing reunification as Adam's primary permanent plan with a secondary plan of adoption.[3] The trial court reiterated its concern regarding substance abuse and found respondent had made only "limited progress" on her case plan. Specifically, the trial court noted respondent's lack of "stability with regard to employment, visiting the children, submitting to drug screens, [and] maintaining appropriate contact with [her] social worker." Respondent was also delinquent in her child support payments. The trial court further found that the home in which respondent continued to reside was not in suitable condition based on a surprise visit on 14 November 2018. Specifically, "[t]here were animal feces on the floor"; "trash [was] everywhere"; and "molded food and dirty dishes [were seen] throughout the home."

---

[3] The trial court initially entered a review order but filed an amended order converting the 20 November 2018 proceeding into a permanency-planning hearing by consent of the parties.

¶ 6 After reviewing Adam's permanent plan on 25 March 2019, the trial court entered an order on 30 April 2019 and found:

> Due to the time that [Adam has] been in care and [respondent's] failure to make satisfactory progress to correct the conditions that led to [Adam] being placed in care, it is not possible for [Adam] to be returned to the home of [respondent] immediately or within the next six months.

As such, the trial court changed the permanent plan to adoption with a secondary or concurrent plan of reunification.

¶ 7 On 3 September 2019, DSS filed a petition to terminate respondent's parental rights. DSS alleged that respondent had neglected Adam, *see* N.C.G.S. § 7B-1111(a)(1) (2019), willfully left him in placement outside the home without making reasonable progress to correct the conditions that led to his removal, *see id.* § 7B-1111(a)(2) (2019), and willfully failed to pay a reasonable portion of Adam's costs of care during the preceding six months, *see id.* § 7B-1111(a)(3) (2019).

¶ 8 Following a hearing on 30 June 2020, the trial court entered an order concluding that grounds existed to terminate respondent's parental rights based on neglect and failure to make reasonable progress. *See id.* § 7B-1111(a)(1), (2). The trial court also determined that it was in Adam's best interest that respondent's parental rights be terminated. *See id.* § 7B-1110(a) (2019). Respondent appeals.

¶ 9 Respondent first argues that the trial court erred by terminating her parental rights based on neglect. Specifically, respondent contends that the trial court

improperly relied on circumstances that no longer existed at the time of the termination hearing.

A termination of parental rights proceeding consists of an adjudicatory stage and a dispositional stage. *Id.* §§ 7B-1109, -1110 (2019); *In re Montgomery*, 311 N.C. 101, 110, 316 S.E.2d 246, 252 (1984). At the adjudicatory stage, the petitioner bears the burden of proving by "clear, cogent, and convincing evidence" the existence of one or more grounds for termination under N.C.G.S. § 7B-1111(a). N.C.G.S. § 7B-1109(f). We review a trial court's adjudication "to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re Montgomery*, 311 N.C. at 111, 316 S.E.2d at 253 (citing *In re Moore*, 306 N.C. 394, 404, 293 S.E.2d 127, 133 (1982)). "Findings of fact not challenged by respondent are deemed supported by competent evidence and are binding on appeal." *In re T.N.H.*, 372 N.C. 403, 407, 831 S.E.2d 54, 58 (2019) (citing *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991)).

Here the trial court concluded that a ground existed to terminate respondent's parental rights based on N.C.G.S. § 7B-1111(a)(1) (neglect). A trial court may terminate parental rights pursuant to N.C.G.S. § 7B-1111(a)(1) when it concludes the parent has neglected the juvenile within the meaning of N.C.G.S. § 7B-101. N.C.G.S. § 7B-1111(a)(1). A neglected juvenile is defined, in pertinent part, as a juvenile "whose parent . . . does not provide proper care, supervision, or discipline; . . . or who

lives in an environment injurious to the juvenile's welfare." *Id.* § 7B-101(15) (2019).

We have recently explained that

> [t]ermination of parental rights based upon this statutory ground requires a showing of neglect at the time of the termination hearing or, if the child has been separated from the parent for a long period of time, there must be a showing of . . . a likelihood of future neglect by the parent. When determining whether such future neglect is likely, the district court must consider evidence of changed circumstances occurring between the period of past neglect and the time of the termination hearing.

*In re R.L.D.*, 375 N.C. 838, 841, 851 S.E.2d 17, 20 (2020) (first quoting *In re D.L.W.*, 368 N.C. 835, 843, 788 S.E.2d 162, 167 (2016) (alteration in original); then quoting *In re Z.V.A.*, 373 N.C. 207, 212, 835 S.E.2d 425, 430 (2019)). The determination that a child is likely to experience further neglect if returned to the parent's custody is a conclusion of law and is reviewed de novo. *In re J.O.D.*, 374 N.C. 797, 801, 807, 844 S.E.2d 570, 574, 578 (2020).

In support of its conclusion of neglect pursuant to N.C.G.S. § 7B-1111(a)(1), the trial court made the following findings of fact:

> 9.      [Respondent] completed parenting classes on August 27, 2018.
>
> 10.      [Respondent] provided DSS with a written statement regarding things she learned in parenting classes and the reasons that her children were in foster care.
>
> 11.      [Respondent] has maintained employment and signed a voluntary support agreement. She had a child

support arrearage of $822.62 at the time of this hearing.

12.    [Respondent] completed substance abuse and mental health assessments. [Respondent] was diagnosed as suffering from an adjustment disorder with depressed mood and anxiety. [Respondent] was found to meet criteria for methamphetamine use disorder and marijuana use disorder.

13.    [Respondent's] housing was not appropriate as documented by DSS on home visits. In November 2018, DSS social workers visited [respondent's] home and found it in a state of disarray. There were animal feces and urine on the floor. Moldy food and trash were piled up in the kitchen and the home was cluttered with buckets of cigarettes. In February 2019, [respondent] had a pet pig living in the home. The home still needed improvements, although [respondent] had corrected some items.

14.    At an attempted home visit in October 2019, [respondent] told DSS that it was not a good time for the visit because her father had "trashed" the home and assaulted her.

15.    [Respondent] did not consistently submit to drug screens and did not consistently visit with [Adam].

16.    During the time that [Adam] has been in DSS custody, [respondent] was asked to submit to fifty-two random drug screens. She submitted to thirty-four screens. Thirty-two screens were negative and two were positive. She failed to submit to eighteen drug screens.

17.    During the time that [Adam] has been in DSS custody, [respondent] could have had seventy-seven visits with [Adam]. [Respondent] participated in only twenty-eight total visits during the pendency of this case.

18.    DSS routinely had difficulty contacting [respondent] to come in for random drug screens.

19. [Respondent] appeared overwhelmed during her visits and [Adam] seemed confused. [Adam] acted out following visits with [respondent].

20. [Respondent] and [Adam] do not have a bond.

21. [Adam] has spent one-half of his life in foster care.

22. [Respondent has] neglected [Adam]. . . . [Respondent] has provided no care for [Adam] since January 2017.

23. There is a significant possibility of future neglect by [respondent] in the event [Adam] was to be returned to her care. [Respondent] has failed to correct the conditions that led [Adam] to be placed in foster care.

. . . .

26. [Respondent] has failed to show that [she] could serve as a responsible custodian for [Adam] during the period that [Adam] has been in foster care.

¶ 13 We first address respondent's challenges to findings of fact 13, 19, 20, 22, 23, and 26. Respondent contends that in finding of fact 13, the characterization of her housing as "not appropriate" at the time of the termination hearing is unsupported by the evidence. We disagree. The hearing evidence shows that respondent remained in the residence owned by the maternal grandmother where she resided when DSS removed Adam in October 2017. DSS social worker Jamie Seager testified that at no time did she observe respondent's residence in a condition suitable for Adam. At a home visit in November 2018, she found "animal urine and feces all over the house," "animal shavings poured in the living room floor," "molded food on the tables [and]

on the stove," and piles of trash in the kitchen. In February 2019, respondent and her boyfriend "had a pig living inside the home," "a sandbox that appeared that the pig stayed in in the living room floor," and "buckets of cigarette butts and trash on the living room floor." In October 2019, respondent refused to allow Ms. Seager into the residence, claiming her father had assaulted her and "trashed their house." Ms. Seager attempted home visits on three additional dates in 2019, but respondent was either not at home or did not answer the door. While respondent argues that her housing conditions and relationship with the maternal grandmother had improved, the trial court was free to disbelieve respondent's testimony. The evidence thus supports the finding that respondent failed to obtain safe and appropriate housing.

¶ 14     Respondent next challenges finding of fact 19, which states that she "appeared overwhelmed" during visits and that Adam "seemed confused." Respondent's challenge is meritless. Ms. Seager described respondent as being "overwhelmed" during the visitations that she supervised. She also described Adam as "very confused during the visits" and "more interested in playing with toys than interacting with . . . [respondent]."

¶ 15     Respondent next contends that finding of fact 20 incorrectly states that she and Adam "do not have a bond." Respondent's argument lacks merit. Ms. Seager testified that respondent appeared to share a bond with Adam's brother but not with Adam. DSS community support technician Lisa Phillips, who arranged respondent's

drug screens and assisted in supervising approximately eleven of her visits, gave the following response when asked to describe respondent's bond with Adam:

> Well, I noticed that [respondent] would go to [Adam], you know. I'm not saying that was her favorite, but she did go to [Adam]. And he -- I think he recognized her, you know, as the person that came to do the visits, but I didn't see like a real bond of any kind other than, you know, they're just -- I mean, he didn't -- he wasn't afraid of her.

To the extent that these accounts conflict, the trial court was free to accept Ms. Seager's testimony. *See In re T.N.H.*, 372 N.C. at 411, 831 S.E.2d at 61 ("[I]t is the trial judge's duty to consider all the evidence, pass upon the credibility of the witnesses, and determine the reasonable inferences to be drawn from the testimony." (citing *In re D.L.W.*, 368 N.C. at 843, 788 S.E.2d at 167–68)).

Respondent next argues that finding of fact 22 incorrectly states that she "neglected the minor child" and "has provided no care for [Adam] since January 2017." To the extent this finding refers to respondent's prior neglect of Adam, which led to his removal from the home by DSS on 27 October 2017 and his adjudication as a neglected juvenile on 4 December 2017, finding of fact 22 is supported by the evidence.[4]

Respondent next contends that finding of fact 23 incorrectly states that she

---

[4] Though not raised by the parties, the reference to January 2017 in finding of fact 22 appears to be a scrivener's error because DSS did not obtain custody of Adam until 27 October 2017. As such, the evidence supports the finding that respondent had provided no care for Adam since 27 October 2017 rather than January 2017.

"failed to correct the conditions that led [Adam] to be placed in foster care" and that finding of fact 26 incorrectly states that she "failed to show that [she] could serve as a responsible custodian for [Adam] during the period that [he] has been in foster care." We disagree. Though the parties consented to the trial court's adjudication of Adam as neglected on 4 December 2017 without any findings of fact, the juvenile petition filed by DSS alleged Adam was neglected because of a lack of proper supervision and continuing conflicts in the home between respondent and the maternal grandmother. Subsequent events revealed that respondent's substance abuse and the squalid conditions in the home were additional problems contributing to the need for Adam's removal.

At the time of the termination hearing, respondent continued to live in the maternal grandmother's residence, which DSS never observed to be in a condition suitable for children. The evidence thus shows respondent failed to correct the problems with Adam's home environment which contributed to his removal. Though respondent completed parenting classes, mental health and substance abuse assessments, and twenty hours of substance abuse counseling in 2018, she failed to submit to eighteen drug screens requested by DSS and tested positive for controlled substances on two occasions. Respondent's routine noncompliance with the drug testing requirement of her case plan, particularly in light of her diagnoses of methamphetamine use disorder and marijuana use disorder, supports a finding that

she had failed to resolve the issue of substance abuse. Respondent also contends that any difficulties she displayed in managing multiple children were no longer an issue because she had signed relinquishments of her parental rights to Adam's brother and sister the day before the hearing. As the trial court correctly noted, however, respondent was still able to revoke her relinquishments at the time of the termination hearing. *See* N.C.G.S. § 48-3-706(a) (2019) ("A relinquishment of . . . any minor may be revoked within seven days following the day on which it is executed by the . . . minor's parent or guardian, inclusive of weekends and holidays."). Further, respondent attended only twenty-eight of the seventy-seven visits she was offered with Adam, demonstrating her inability or unwillingness to properly care for Adam. Therefore, competent evidence supports findings of fact 23 and 26.

¶ 19    Having addressed each of respondent's challenges to the trial court's findings of fact, we next consider whether the trial court's valid findings support its conclusions of law. *In re S.D.*, 374 N.C. 67, 86, 839 S.E.2d 315, 329 (2020). Respondent contests the trial court's conclusion that Adam faced a significant likelihood of future neglect if returned to respondent's care. Respondent argues the trial court based its conclusion on circumstances that no longer existed and failed to consider her circumstances and fitness to care for Adam at the time of the hearing.

¶ 20    We conclude the trial court's findings accurately portray respondent's status at the time of the termination hearing as required to support an adjudication of

neglect under N.C.G.S. § 7B-1111(a)(1). Findings of fact 13 through 18 demonstrate respondent's lack of progress in obtaining appropriate housing, submitting to drug screens, and attending visitations—all of which reflect her inability to provide Adam proper care and supervision in a safe home environment. Specifically, respondent failed to submit to eighteen drug screens and tested positive for use of a controlled substance twice. Owing at least in part to her substance abuse issues, respondent attended only twenty-eight of the seventy-seven visits offered by DSS. Though respondent testified she was afraid of exposing her children to COVID-19, she made no attempt to contact DSS to request video chats or other alternative forms of visitation.

¶ 21        At the time of the hearing, Adam had spent half of his life in DSS custody. Respondent's prior neglect of Adam and her circumstances at the time of the termination hearing support the trial court's conclusion that Adam faced a significant likelihood of future neglect if returned to respondent's care. *See In re M.Y.P.*, 378 N.C. 667, 2021-NCSC-113, ¶¶ 19–20 (concluding "the trial court properly determined that there was a high probability of repetition of neglect" based, in part, on the respondent's failure to visit the child consistently and to address issues of housing and substance abuse); *In re J.J.H.*, 376 N.C. 161, 185, 851 S.E.2d 336, 352–53 (2020) (concluding there was a likelihood of future neglect where the respondent's housing, though stable, was not appropriate for the children and when the respondent "had

missed at least twenty-two scheduled visits" and had not displayed fluency with parenting the children during visits); *In re M.A.*, 374 N.C. 865, 870, 844 S.E.2d 916, 921 (2020) ("A parent's failure to make progress in completing a case plan is indicative of a likelihood of future neglect." (quoting *In re M.J.S.M.*, 257 N.C. App. 633, 637, 810 S.E.2d 370, 373 (2018))). Therefore, the trial court's findings of fact support its conclusion that a ground existed to terminate respondent's parental rights pursuant to N.C.G.S. § 7B-1111(a)(1).

Because "an adjudication of any single ground for termination under N.C.G.S. § 7B-1111(a) will suffice to support a trial court's order terminating parental rights," *In re L.M.M.*, 375 N.C. 346, 349, 847 S.E.2d 770, 773 (2020) (citation omitted), we need not review the trial court's adjudication under N.C.G.S. § 7B-1111(a)(2). As such, we affirm the trial court's order terminating respondent's parental rights.

AFFIRMED.